1
2
3
4
5
6
7

8            **IN THE UNITED STATES DISTRICT COURT**

9         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 TERRY YUNT,                     No. CIV S-06-1779-CMK

12         Plaintiff,

13     vs.                    MEMORANDUM OPINION AND ORDER

14 COMMISSIONER OF SOCIAL
   SECURITY,

15         Defendant.

16

17 _____/

18         Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19 review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20 Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21 plaintiff's motion for summary judgment (Doc. 18) and defendant's cross-motion for summary

22 judgment (Docs. 19 and 20).

23 / / /

24 / / /

25 / / /

26 / / /

1

## I.  BACKGROUND

Plaintiff applied for social security benefits on June 18, 2004.  In her application, plaintiff claims that disability began on November 21, 2003.  In an adult disability report submitted with her application, plaintiff claims her disability consists of a combination of "chronic fatigue syndrome, chronic depression, non-restorative sleep, multiple muscular tender points, and widespread skeletal pain."  Plaintiff is a United States citizen born June 28, 1954, with a high school education and some college courses.

### A.    **Summary of the Medical Evidence**

The certified administrative record ("CAR") contains the following:  (1) physical residual functional capacity assessment dated July 13, 2004 (CAR 163-70); (2) mental residual functional capacity assessment and related psychiatric review technique form dated July 23, 2004 (CAR 170-88); (3) medical records from U.C. Davis Medical Group covering the period from May 17, 2001, through August 25, 2005 (CAR 190-208; 296-320); (4) chart notes from Joyce Povelli, MFCC, dated August 31, 2004 (CAR 230-35); (5) physical residual functional capacity assessment dated November 18, 2004 (CAR 237-44); (6) psychiatric review technique form dated November 19, 2004 (CAR 249-62); (7) medical records from Fair Oaks Psychiatric Associates covering the period from October 4, 2004, through October 13, 2005 (CAR 265-72; 323-28); (8) fibromyalgia residual functional capacity assessment dated December 13, 2004 (CAR 284-88); (9) mental residual functional capacity assessment dated March 15, 2005 (CAR 290-94); and (10) psychological medical source statement and evaluation from agency consultative examiner Barry N. Finkel, Ph.D., dated October 6, 2005 (CAR 274-82).

### 1.    Physical Impairments

U.C. Davis Medical Group records covering the period from May 2001 through August 2005 document plaintiff's physical medical care.  In 2003, plaintiff underwent testing related to her complaints of abdominal pain and severe gas, diarrhea, and constipation for over three months.  The records note a history of GERD and that medication – Protonix – was not

helping with the abdominal pain complaints.  A small hiatal hernia without evidence of reflux

was observed in July 2003.  In September 2003 gastroesophageal reflux disease was diagnosed

and the presence of cholelithiasis was confirmed.  Plaintiff underwent a cholecystectomy that

month.  Fibromyalgia is indicated in the records of November 2003, January 2004, and July

2004.  Records from August 2004 indicate migraine headaches.  In January 2005, rheumatologist

Gurtej S.  Cheema, M.D., conducted an examination of plaintiff in order to rule out other

etiology for her fibromyalgia symptoms.  Dr. Cheema observed normal objective findings on

physical examination and also observed that her most recent lab and CT results were normal.  Dr.

Cheema's conclusion was:

> The bottom line is that despite a lot of musculoskeletal symptoms, there is
> no clinical evidence of an underlying autoimmune disease which could be
> responsible for them.

In July 2004, a non-examining agency physician, prepared a physical residual

functional capacity assessment in which he concluded that plaintiff could:  occasionally lift and

carry up to 20 pounds and frequently lift and carry up to ten pounds; stand and/or walk about six

hours in a normal day; sit about six hours in a normal day; push and/or pull without limitation.

He noted that plaintiff was limited to occasional climbing, stooping, kneeling, crouching, and

crawling.  The doctor did not note any other limitations.

Another physical residual functional capacity assessment was completed in

November 2004 by non-examining doctor, George A. Jansen, M.D.  Dr. Jansen noted the same

functional capacity as was observed in July, except he added that plaintiff should never climb.

In December 2004, treating physician Heather Bevan, M.D. prepared a

"Fibromyalgia Residual Functional Capacity Questionnaire."  The following are listed as

diagnosed physical impairments:  GERD, irritable bowel syndrome, obesity, and headaches.  The

form also notes that plaintiff has been a patient since 2001 and that fibromyalgia was diagnosed

in July 1999.  Plaintiff reported the following physical symptoms:  tender points, non-restorative

sleep, morning stiffness, muscle weakness, swelling in the hands, frequent severe headaches,

vestibular dysfunction, arm numbness and tingling, and chronic fatigue.  Plaintiff described constant pain throughout her body.  Dr. Bevan opined that plaintiff could sit or stand continuously for only 30 minutes.  She stated that plaintiff could only perform jobs which permit shifting positions at will from sitting, standing, and walking, and that plaintiff would require unscheduled breaks.  Dr. Bevan stated that plaintiff could frequently lift and carry less than ten pounds, but never lift or carry more than that weight.  Plaintiff was also limited with respect to crouching, stooping, bending, and repetitive reaching, handling, and fingering.

### 2.    Mental Impairments

The record contains a mental residual functional capacity assessment dated July 23, 2004.  The non-examining agency physician observed no significant limitations in any category except moderate limitations in plaintiff's ability to understand, remember, and carry out detailed instructions.  The doctor noted a diagnosis of depression, not otherwise specified, and that plaintiff was taking medications.  Mild limitations were noted as to activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.

The record also contains chart notes from Joyce Povelli, MFCC, dated August 31, 2004.  When she provided these records, Ms. Povelli noted that she only saw plaintiff once and did not specialize in depression.  Ms. Povelli recorded the following subjective complaints: fibromyalgia, depression, chronic fatigue, headaches, difficulty concentrating, and difficulty communicating.  Ms. Povelli's do not reveal any objective findings.

A psychiatric review technique form completed by a non-examining agency doctor in November 2004 indicates no limitations in activities of daily living and mild limitations in social functioning and maintaining concentration, persistence, and pace.

Plaintiff's primary treating mental health provider is Fair Oaks Psychiatric Associates.  The record contains treatment notes from this source covering the period from October 4, 2004, through October 13, 2005.  These records, however, are largely illegible or undecipherable.  In her motion for summary judgment, plaintiff describes the Fair Oaks records

1    as follows:

2              Ms. Yunt has been treated at Fair Oaks Psychiatric Association
         since October 2004, (T 263-273. 321-328) for anxiety, depression, fatigue,
3        and difficulty sleeping (T 324, 325, 326, 328).  She has been experiencing
         racing thoughts (T 265, 266) and has complained of inability to focus (T
4        266).  She has been prescribed Lithium, Xanax, Trazadone, and Paxil (T
         265).  Dr. [Mandeep] Behniwal, Ms. Yunt's treating psychiatrist, assessed
5        bipolar disorder with mood swings, anxiety, sleep problems, anhedonia,
         hopelessness, decreased energy, easy distractibility, problems
6        concentrating, manic and depressive episodes, decreased energy, and
         racing thoughts (T 290-291).  Dr. Behniwal concluded that Ms. Yunt is
7        seriously limited in her ability to work in coordination with others and
         complete a normal workday and workweek without interruption from
8        psychological symptoms (T 292).  Dr. Behniwal further concluded that
         Ms. Yunt is unable to meet competitive standards in her ability to sustain
9        an ordinary routine without special supervision, make simple work-related
         decisions, perform at a consistent pace without an unreasonable number
10       and length of rest periods, get along with coworkers and peers without
         unduly distracting them or exhibiting behavioral extremes, and be aware of
11       normal hazards and take appropriate precautions (T 292).  Dr. Behniwal
         noted moderate limitations in Ms. Yunt's ability to maintain concentration,
12       persistence, or pace, and one or two episodes of decompensation within 12
         months, each of at least two weeks duration (T 293).  She is expected to be
13       absent from work more than four days per month.  Dr. Behniwal stated
         that her patient is not a malingerer (T 294).

14

15             Finally, examining agency doctor, Barry N. Finkel, Ph.D., conducted a disability

16   evaluation regarding plaintiff's mental impairments on October 6, 2005.  Dr. Finkel observed

17   that plaintiff's overall intellectual functioning is average, but that her working memory is "low

18   average."  Results of the MMPI-II test were reported as "valid and highlight depression, anxiety,

19   low energy, and social isolation."  Dr. Finkel also observed:

20             The claimant is polite, cooperative, appropriately dressed and groomed.
         She moves stiffly, gingerly, and hands are tremulous.  Mood appears
21       depressed with constricted affect.  She does give every indication of an
         individual in at least moderate discomfort; she does make an effort to be
22       pleasant and engaging.  She relates her history in a matter-of-fact manner.
         She recalls an unhappy childhood and struggles with depression from at
23       least adolescence.  Just the same, she is clear that she was functional.  She
         continued to work following a low back injury in 1986, with more or less
24       chronic low back pain radiating into her right leg.  Symptoms became
         progressively worse until 1999 when she sought medical treatment and
25       was diagnosed with fibromyalgia.  There is a concurrent history of
         progressively increasing somatic symptoms as well as increasing mood
26       instability.  She recalls a general, low-level depression, developing into

5

some weeklong episodes of more severe depression in her 20s and 30s. By her 40s, she recalls hypomanic episodes lasting a day or two. The history could not suggest episodes of major depression or frank mania; hence, the diagnosis of Cyclothymia.

. . . She can follow at least simple instructions. She should be able to attend to and follow through on tasks without direct supervision. Interactions with others such as supervisors and peers would be affected by chronic pain and depression. Attention and concentration are within normal limits. Pace would be variable from average to markedly impaired. Her ability to work over an eight-hour day and attend to a regular work schedule is considered at least markedly impaired. She is competent to manage funds.

**B.   Summary of Plaintiff's Hearing Testimony**

Plaintiff testified at her administrative hearing (CAR 347-61). Plaintiff testified that she stopped working in November 2003 because she was "getting more and more disorganized and fatigued and not being able to do simpl[e] functions. . . ." She stated that, one day, her mind went blank and she couldn't answer the phone – she "didn't know how to do it." She also testified that during 2003 and 2004 she saw her treating physician "probably every three months" and her psychiatrist once a month. The year of the hearing – 2005 – plaintiff had not seen her treating physician at all but still saw her psychiatrist every month. She testified that she takes five psychiatric medications and one medication for acid reflux. At the time of the hearing, plaintiff said her weight was 235 pounds and that a year prior it was about 215 pounds.

As to her daily life, plaintiff testified that she sleeps eight hours a night and takes four-hour naps during the day. Plaintiff has a 13-year-old son and an 11-year-old daughter, both of whom live at home with her. She also has a roommate. Plaintiff stated that she drives approximately 16 miles per day to take her daughter to and from school. Plaintiff testified that she does not have any problems standing for up to two hours at a time. She also stated that she can only lift up to ten pounds due to a prior back injury. As to walking, plaintiff stated that she can walk, but not very far. She said she can sit for at most one hour at a time and then she has to get up and walk around. Plaintiff testified that, in the morning hours (6:00 a.m. through 12:00 noon), she makes breakfast, gets her children ready for school, and takes her daughter to school.

Then, she returns home and falls asleep until noon.  In the afternoon hours (12:00 noon through 9:00 p.m.), plaintiff sits in her recliner, reads the newspaper, and watches television.  She does not read books because they take too much concentration.  Plaintiff's roommate does the cooking and laundry.  Plaintiff does no household chores.

As to plaintiff's mental impairments, plaintiff stated that it is hard for her to be around people.  She testified that she's been "very depressed for quite a long time."  When asked about her mental condition in 2004, specifically times when she was in a good mood, plaintiff testified that she'd "clean the house and cook the dinner and work[] . . . full time."  She stated that she cannot currently work due to depression and "blank spots where I can't think."  She also stated she is constantly fatigued due to medications.  She stated she can only stay focused for 15 minutes at a time.

Regarding physical impairments, plaintiff testified that she was diagnosed with fibromyalgia in 1999.  As to symptoms from this condition, plaintiff stated:  "I have tenderness and pain radiating down the back of my neck, across my shoulders, and down both arms.  I have vertigo, and I have difficulty with bowels.  I either have diarrhea or I have constipation."  When asked how many total hours in a day she could stand or walk, plaintiff testified that she could do those things only "about three-and-a-half, four hours" but that, roughly 15 days a month, she can't even get out of bed.

### C.    Procedural History

Plaintiff's claim was initially denied.  Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on December 13, 2005, before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres.

In his January 24, 2006, decision, the ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits . . . and is insured for benefits through the date of this decision;

/ / /

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability;

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations . . . ; the claimant has severe fibromyalgia syndrome, morbid obesity, a bipolar disorder, a cyclothymic disorder, and a mood disorder secondary to medical issues;

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision;

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments;

7. The claimant has the retained residual functional capacity to perform light work; the functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work; light work includes the ability to stand, walk, and sit for at least six hours in an eight hour period with regular break opportunities, and to lift 20 pounds occasionally and ten pounds frequently; from a non-exertional standpoint, she is limited to the performance of unskilled work activity;

8. The claimant is unable to perform any of her past relevant work;

9. The claimant is an individual who is approaching advanced age;

10. The claimant has a high school education;

11. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material;

12. The claimant has the residual functional capacity to perform a full range of light work on a sustained basis;

13. In light of the claimant's residual functional capacity, age, education, and work experience, section 404.1569 of Regulations 4, Rule 202.14 of Table No. 2, and Rule 201.16, Table No. 1 of Appendix 2, Subpart P, Regulation No. 4, provide that she is not disabled; and

14. The claimant was not under a disability . . . at any time through the date of this decision.

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits. After the Appeals Council declined review on June 20, 2006, this appeal followed.

8

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## III.  DISCUSSION

In her motion for summary judgment, plaintiff outlines the following six issues:

1.  Whether the ALJ erred in failing to understand the true nature of fibromyalgia and the fact that it can form the basis of a disability claim, even in the absence of objective findings;

2.  Whether the ALJ erred in failing to properly analyze the effect of fatigue on Plaintiff's residual functional capacity;

3.      Whether the ALJ erred in rejecting the opinion of the treating and examining medical sources;

4.      Whether the ALJ erred in failing to properly evaluate Plaintiff's mental impairment;

5.      Whether the ALJ erred in failing to credit Plaintiff's testimony;

6.      Whether the ALJ erred in not securing testimony of a Vocational Expert, given Plaintiff's significant non-exertional limitations, and, thereby, failed to sustain his burden of establishing that there is other work in the national economy that Plaintiff can perform.

## A.      Evaluation of the Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

Plaintiff argues that the ALJ failed to properly evaluate the opinions of treating and examining medical professionals.  Specifically, she challenges the ALJ's analysis of the opinions of Drs. Bevan, Behniwal, Cheema, and Finkel.  She also argues that the non-examining doctors' opinions are insufficient to reject the treating and examining doctors' opinions and, therefore, cannot constitute substantial evidence.

### 1.   Dr. Bevan

Dr. Bevan, who is a treating physician, completed a "Fibromyalgia Residual Functional Capacity Questionnaire" on December 13, 2004.   She opined: (1) plaintiff could sit or stand continuously for only 30 minutes; (2) she could only perform jobs which permit shifting positions at will from sitting, standing, and walking,; (3) she would require unscheduled breaks; (4) she could never lift or carry more than ten pounds; and (5) she was limited with respect to crouching, stooping, bending, and repetitive reaching, handling, and fingering.  The ALJ gave little weight to these opinions.  He stated:

> [T]he undersigned gives little evidentiary weight to the extreme findings assessed by the claimant's family practitioner, Doctor Bevan, in her medical assessment completed on December 13, 2004. . . .[T]he opinion is not supported by detailed, clinical diagnostic evidence.

The undersigned finds that Doctor Bevan did not cite objective findings that relate to functional limitations and restrictions assessed.  Her minimal findings noted at the time of her evaluations are not consistent with the extreme limitations she assessed, nor are they consistent with the findings in the other evidence of record. . . .   The undersigned notes gaps in the record between visits to this physician, and it is noted that the record reveals that the claimant did not receive more than rather minimal, conservative treatment of her complaints.  When examined in October 2004, Doctor Bevan noted that the claimant reported that a TENS unit gave her about five hours pain relief.  The claimant was leaving for the Philippines for a few weeks.  Examination revealed the claimant was pleasant and appeared more comfortable and talkative.  Laboratory reports were normal.  On December 13, 2004, Doctor Bevan reported that the claimant's fibromyalgia was stable.

Subsequent records indicate the claimant was alert and in no distress.  Although she had complaints of knee pain in January 2005, examination of the knees was normal, with a full range of motion, no pain on motion, and no effusion, tenderness, ligamentous instability, or deformity noted.  Further, Doctor Bevan's comments with regard to the claimant's depression are not within her expertise as a family practitioner, and are not supported by the record as a whole.  Although she noted in the medical assessment that the claimant used a cane for ambulation, the objective clinical findings cited in her progress notes do not support a finding that such assistive device is medically necessary.  There is no documentation of gait impairments, and the claimant's allegations of dizziness are not supported by the record.  Nonetheless, the undersigned finds that the use of a cane would not impact upon the claimant's ability to perform light work. . . .

The ALJ rejected Dr. Bevan's opinion due to lack of objective findings relating to the assessed

functional limitations.

As to the lack of objective findings, plaintiff argues that this is understandable

given that fibromyalgia is characterized by a lack of clinical evidence to support pain symptoms.

As defendant notes, however, "[t]he ALJ's insistence that a quantification of functional

limitations be based on objective findings is not the same thing as requiring objective findings

for a diagnosis of fibromyalgia."  It is undisputed in this case that plaintiff's fibromyalgia is a

severe impairment.  However, it is reasonable for the ALJ to require Dr. Bevan's assessment of

specific functional limitations to be supported by objective findings.  For example, grip strength

tests would have provided objective findings to support Dr. Bevan's assessed limitations with

respect to handling and fingering.  Similarly, range-of-motion test data would have supported the

doctor's limitations as to bending, crouching, and stooping.  However, no such results are cited in Dr. Bevan's "Fibromyalgia Residual Functional Capacity Questionnaire," which appears to be a checklist of subjective symptoms unsupported by clinical observations.

The court has reviewed the medical records from U.C. Davis, where Dr. Bevan and others provided services to plaintiff,[1] to determine whether objective findings support the limitations she assessed.  Objective findings as to plaintiff's physical problems are as follows:

| | |
|---|---|
| May 17, 2001 | Patient is more at ease and more comfortable today; fibromyalgia stable. |
| July 3, 2003 | No acute distress; abdomen tender to touch lightly; no guarding; labs unremarkable. |
| September 4, 2003 | Overall, patient is awake, alert, and in no apparent distress; neck supple without adenopathy, back without CVA tenderness, extremities warm and well perfused. |
| September 22, 2003 | Patient is in no apparent distress. |
| September 23, 2003 | Appears much more comfortable; she is getting off the daytime Vicodin. |
| November 24, 2003 | Tender at all trigger points. |
| January 5, 2004 | Tender at all trigger points; her pain is under good control. |
| July 29, 2004 | Pain level 9/10; pleasant; appears much better than at previous visits; minimal tenderness in right upper quadrant; normal bowel sounds. |
| August 3, 2004 | Pain level 9/10; uncomfortable, but no acute distress; nontender on palpation of the scalp; no adenopathy; no bruits; lungs clear; heart rate regular and rhythmic. |

Notably, there are no records indicating that Dr. Bevan ever performed any range-of-motion testing, or otherwise sought to objectively quantify the assessed limitations provided on the fibromyalgia questionnaire.  While several entries indicate tenderness and pain, there are no specific findings to support the particular limitations assessed by Dr. Bevan.

---

[1]      Where other doctors provided services to plaintiff, Dr. Bevan was provided copies of their notes.

1    As to Dr. Bevan's opinion about plaintiff's depression, the ALJ sated: ". . .Doctor

2    Bevan's comments with regard to the claimant's depression are not within her expertise as a

3    family practitioner, and are not supported by the record as a whole."   Plaintiff argues that the

4    "ALJ's reasoning is contrary to established legal principles" because a licensed physician is

5    qualified to express an opinion as to a patient's mental state.  Dr. Bevan provided the following

6    observations regarding plaintiff's mental state:

7    | May 8, 2003 | Initial diagnosis of depression, but none recently; no suicidal ideation; no crying spells; |

8

9    | September 2, 2003 | Depression. |

10   | November 24, 2003 | Depressed; withdrawn; flat affect; poor eye contact. |

11   The court accepts that Dr. Bevan may offer an opinion as to plaintiff's mental state.  Nonetheless,

12   Dr. Bevan's clinical notes regarding depression are scant at best and are not specific.  In addition,

13   Dr. Bevan did not provide any particular opinion as to mental limitations.  The ALJ merely noted

14   that he did not give much weight to Dr. Bevan's notes regarding depression, instead favoring the

15   specific mental evaluation findings of the non-examining agency specialists.

16   2.   Drs. Behniwal and Finkel

17   Dr. Behniwal, who is plaintiff's treating psychiatrist, also assessed significant

18   limitations.  According to plaintiff, Dr. Behniwal opined:  (1) plaintiff is seriously limited in her

19   ability to work in coordination with others and complete a normal workday and workweek

20   without interruption from psychological symptoms; (2) she is unable to meet competitive

21   standards in her ability to sustain an ordinary routine without special supervision; (3) she cannot

22   make simple work-related decisions; (4) she cannot perform at a consistent pace without an

23   unreasonable number and length of rest periods; (5) she cannot get along with co-workers and

24   peers without unduly distracting them or exhibiting behavioral extremes; and (6) she cannot be

25   aware of normal hazards and take appropriate precautions.  Dr. Behniwal also noted moderate

26   limitations in plaintiff's ability to maintain concentration, persistence, or pace, and one or two

14

1    episodes of decompensation.  The ALJ did not give significant weight to these opinions:

2    [Dr. Behniwal's] extreme findings are inconsistent with his progress notes
     which indicate that although the claimant was depressed, mental status
3    examination was normal.  The claimant was alert and oriented . . . .
     Thought processes were linear and she demonstrated good eye contact.
4    There were no auditory or visual hallucinations.  Clinical notations in
     December 2004 indicate the claimant was sleeping with medications and
5    her concentration had improved.  Progress notes in May 2005 indicate the
     claimant had been doing well, and in June 2005, she was depressed, but
6    reported no mood swings, and noted that her sleep had improved.
     Significantly, the final notation in October 2005 indicated that the
7    claimant was doing better, and was not as depressed, although she was
     anxious about her social security hearing.  Moreover, Doctor Behniwal's
8    extreme conclusions are inconsistent with his assessment of the claimant's
     Global Assessment of Functioning (GAF) at 69, which is indicative of
9    only some mild mental limitations.[2]

10       Dr. Finkel, who is an agency examining doctor, expressed the following opinions

11   regarding plaintiff's mental residual functional capacity:  (1) plaintiff can follow at least simple

12   instructions; (2) she should be able to attend to and follow through on tasks without direct

13   supervision; (3) her Interactions with others, such as supervisors and peers, would be affected by

14   chronic pain and depression; (4) plaintiff's attention and concentration are within normal limits;

15   (5) plaintiff's pace would be variable from average to markedly impaired; and (6) her ability to

16   work over an eight-hour day and attend to a regular work schedule is considered at least

17   markedly impaired.  While the ALJ agreed that the objective findings made by Dr. Finkel were

18   supported by other evidence in the record, he rejected many of Dr. Finkel's ultimate conclusions

19   regarding plaintiff's abilities.  Specifically, the ALJ stated:

20       [T]he undersigned finds that the extreme conclusions reached by Doctor
         Finkel in his report and in an assessment form which he completed, are not
21       supported by clinical findings, the results of his examination, and are
         inconsistent with the record as a whole.  Further, the limitations are
22       inconsistent with his narrative report, which assessed moderate mental
         limitations (Global Assessment of Functioning of 55).  Doctor Hicks[3]
23

24       [2]      As indicated above, Dr. Behniwal's treatment notes are illegible or
     undecipherable.  Plaintiff does not contend that the foregoing summary is inaccurate.  Rather, she
25   argues that the selected entries are given out of context.

26       [3]      The court assumes the ALJ intended to refer to Dr. Finkel.

15

appears to have based functional limitations upon the claimant's recitation of her subjective pain complaints, inasmuch as mental status examination was essentially normal, and it was noted that although the claimant had suffered from depression most of her life, she had been functional. The objective findings in his narrative report support a finding that the claimant is capable of performing unskilled work.

Plaintiff asserts that the "ALJ erred in rejecting the conclusions of the treating psychiatrist [Dr. Behniwal] and examining psychologist [Dr. Finkel]." As to both doctors, the ALJ concluded that their assessments of extreme mental capacity limitations were inconsistent with the record as a whole. Dr. Behniwal's chart notes (to the extent they are legible and decipherable) can be summarized as follows:

| | |
|---|---|
| October 4, 2004 | Mood depressed; increased appetite; poor energy |
| October 21, 2004 | Increased energy; decreased sleep; anxious; racing thoughts; able to focus; mood is flat. |
| November 19, 2004 | Decreased energy; not capable of focusing; decreased libido; assessment of "mood disorder NOS." |
| December 10, 2004 | Sleepy with medications; racing thoughts; increased anxiety; assessment of "bipolar disorder." |

In his March 15, 2005, assessment, Dr. Behniwal indicated a GAF of 69 with the highest GAF in the past year at 75. He described the following clinical observations to support his assessment: mood swings, anxiety, sleep problems, fatigue, problems concentrating, and racing thoughts. on October 6, 2005, Dr. Finkel assessed a GAF of only 55.

The ALJ did not find any non-exertional mental limitations to plaintiff's residual functional capacity, relying on the conclusions reached by non-examining agency consultative sources. Specifically, the ALJ relied on the July 23, 2004, and November 19, 2004, mental residual functional capacity assessments, which did not note any significant mental limitations. Contrary to the ALJ's analysis and defendant's reading of the record, the court finds that at least some of the limitations assessed by Drs. Behniwal and Finkel are supported by their clinical observations. In particular, Dr. Behniwal's notes indicate that plaintiff had mood swings and

1  energy swings consistent with a bipolar condition.  Further, Dr. Behniwal consistently recorded

2  racing thoughts, anxiety, and a depressed or flat mood.  The ALJ could not reject limitations

3  assessed by Dr. Behniwal based on these observations on the basis of contradictory conclusions

4  reached by the non-examining sources.  On the one hand, the ALJ put great reliance in the

5  agency non-examining source conclusions but, on the other hand, rejected the conclusions of

6  agency examining source, Dr. Finkel, who found that plaintiff's pace would be variable from

7  average to markedly impaired and that plaintiff's ability to work over an eight-hour day and

8  attend to a regular work schedule is at least markedly impaired.   Dr. Finkel also observed that

9  plaintiff's working memory is "low average" and that results of the MMPI-II test highlighted

10 depression, anxiety, low energy, and social isolation.  These specific objective findings support

11 some of the assessed mental limitations.

12         The court finds that a remand is appropriate to allow the ALJ to re-evaluate

13 plaintiff's residual functional capacity in light of the mental limitations assessed by Drs.

14 Behniwal and Finkel.

15                 3.   Dr. Cheema

16         Dr. Cheema is a rheumatologist who examined plaintiff following a referral from

17 her primary care physician.  Specifically, he was tasked with determining whether plaintiff's

18 fibromyalgia symptoms could have any other causes.  Dr. Cheema concluded:

19         The bottom line is that despite a lot of musculoskeletal symptoms, there is
20         no clinical evidence of an underlying autoimmune disease which could be
           responsible for them.

21 As to Dr. Cheema, the ALJ merely summarized his objective findings.   The ALJ did not

22 criticize Dr. Cheema's objective findings.  Instead, he noted them in support of his conclusions.

23         Plaintiff argues that Dr. Cheema's statement that plaintiff should not overextend

24 herself constitutes a medical opinion and that, because the ALJ did not discuss this comment, he

25 committed reversible error.  The court does not agree.  Dr. Cheema's comment does not express

26 any specific opinion with respect to plaintiff's work abilities.  The comment could apply to an

17

1    individual with significant limitations as well as one without.  For example, it could be said that

2    an athlete should not overextend himself.  Thus, the court cannot discern any particular opinion

3    in Dr. Cheema's comment which would relate to plaintiff's ability to work.  The ALJ did not

4    criticize Dr. Cheema's objective findings.  Instead, he noted them in support of his conclusions.

5

6            **B.**      ALJ's Residual Functional Capacity Determination

7            Residual functional capacity is what a person "can still do despite [the

8    individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

9    Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

10   "physical and mental capabilities").  In determining residual functional capacity, the ALJ must

11   assess what the plaintiff can still do in light of both physical and mental limitations.  See 20

12   C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085

13   (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

14   Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow

15   a special procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record

16   pertinent findings and rate the degree of functional loss.  See 20 C.F.R. §§ 404.1520a(b),

17   416.920a(b).

18           Here, the ALJ determined that plaintiff retained the residual functional capacity

19   for the full range of light unskilled work, with no limitations.  Specifically, he made the

20   following residual functional capacity determination:

21           The undersigned has considered all the medical evidence, including the
             claimant's physical and mental impairments and how they may interrelate,
22           and the testimony obtained at the hearing, and finds that the claimant's
             combined impairments do not prevent her from performing unskilled light
23           work activity on a sustained basis.  These opinions are consistent with the
             conclusions of the State Agency medical consultants, who are highly
24           trained specialists in the field of disability.

25           Evaluating the claimant's subjective complaints . . ., the undersigned
             concludes that she is not limited by incapacitating pain or limitation from
26           performing light work.  This conclusion is reached after reviewing the

                                                    18

1
2

> claimant's statements concerning her abilities, which include a range of activities that are not compatible with the presence of a disabling level of pain.

3 Plaintiff's first, second, and fourth arguments are related to the ALJ's residual functional

4 capacity determination.  She argues the ALJ failed to properly understand the nature of

5 fibromyalgia when he noted the lack of ongoing and significant objective clinical findings which

6 would suggest a limited functional capacity.  Plaintiff also argues that the ALJ failed to properly

7 consider the effect of fatigue on her functional capacity.  Finally, she argues that the ALJ failed

8 to properly consider her mental impairments.

9        1.    Fibromyalgia

10       Plaintiff argues that the ALJ demonstrated a misunderstanding of the nature of

11 fibromyalgia because he focused whether objective findings supported plaintiff's pain symptoms.

12 She asserts that fibromyalgia, by its very nature, is a disorder which cannot be diagnosed by

13 clinical observations.  Rather, diagnosis of fibromyalgia is based entirely on the patient's reports

14 of pain and other symptoms.  As to plaintiff's fibromyalgia – which the ALJ concluded was a

15 severe impairment – the ALJ cited Preston v. Secretary of Health and Human Services, 854 F.2d

16 815 (6th Cir 1988), and stated:

17
18
19
20
21
22

> Although fibromyalgia is a recognized disease that can be disabling, it is characterized by a lack of objective signs.  Before accepting a diagnosis of fibromyalgia, several factors must be considered, such as the following: (1) whether the treating physician referred the claimant to a rheumatologist or other specialist familiar with diagnosing fibromyalgia; (2) whether the claimant was referred for physical therapy or a pain clinic for treatment, and whether any pain medicine prescribed was for mild or severe pain; (3) whether the claimant's complaints were typical for this disease; (4) whether the claimant received pain relief through injections of cortisone or Novocain into focal tender points; and (5) whe[ther] physicians systematically attempted to eliminate other causes.

23 The ALJ then applied these factors to plaintiff's case and stated:

24
25
26

> . . . There has been no specific treatment for the claimant's allegations, and there is no indication that she is taking pain medication or that she has received injections or physical therapy treatment, or that she has been referred to a specialist or pain clinic for her pain symptoms.  Treatment options discussed include lifestyle modifications, better sleep hygiene, as

1   well as improving exercise tolerance.

2   Plaintiff cites Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004), in support

3   of her argument.  In Benecke, the Ninth Circuit concluded the ALJ erred with respect to his

4   analysis of the claimant's fibromyalgia because he required objective evidence to establish the

5   existence of a disease that eludes such measurement.  See id. (citing Green-Younger v. Barnhart,

6   335 F.3d 99, 108 (2nd Cir. 2003)).  Plaintiff's case, however, is distinguishable in that the ALJ

7   here did not require objective evidence to support the existence of fibromyalgia.  In fact, the ALJ

8   determined that plaintiff's fibromyalgia was a severe impairment.  He did not find that it resulted

9   in disabling pain.  This determination was based on, among other things, plaintiff's lack of any

10   pain management treatment, including attending a pain clinic, taking pain medications, or

11   obtaining cortisone injections.

12   Plaintiff's argument selects a quote from the hearing decision out of context

13   which does not relate specifically to the ALJ's fibromyalgia finding.  She quotes the following:

14   However, the undersigned notes the lack of ongoing and significant
     objective clinical findings which would warrant a finding of disability.
15   The medical evidence shows that although the claimant continues to have
     physical discomfort, objective medical evidence shows that various
16   examinations have not defined any ongoing and significant motor deficits
     or . . . sensory findings.  The records show no indication of muscle
17   wasting, gross muscle atrophy, or loss of sensation due to nerve damage.

18   This language immediately follows the ALJ's finding concerning plaintiff's ability to perform

19   work in general.  The court does not find that this represents, as plaintiff suggests, a

20   misunderstanding as to the nature of fibromyalgia.  To the contrary, the ALJ clearly stated that

21   he understood that fibromyalgia was characterized by the lack of objective evidence.  The ALJ

22   accepted that plaintiff suffers from fibromyalgia but concluded that the lack of specific objective

23   factors – like pain management treatment – indicated that plaintiff's fibromyalgia was not

24   disabling.  Whether fibromyalgia exists as a severe impairment and whether such impairment

25   results in disabling pain are two very different questions.  As to the latter, the ALJ did not

26   misunderstand the nature of fibromyalgia in reaching his conclusion that it was not disabling.

1    Therefore, the court finds that the ALJ's residual functional capacity assessment is

2    not based on a misunderstanding of fibromyalgia, as plaintiff contends.  Whether the ALJ erred

3    in concluding that plaintiff's fibromyalgia did not result in disabling pain is discussed below in

4    the context of plaintiff's argument concerning the ALJ's credibility finding.

5            2.    Fatigue

6    As to plaintiff's claim of debilitating fatigue, the ALJ stated:

7    . . . Though fatigue was noted on occasion, treatment notes only rarely
     referred to the claimant's actual complaints of fatigue, and do not include
8    clinical observations of a tired or weakened appearance.

9    Based on Dr. Bevan's treatment notes, the court agrees with the ALJ's conclusion.  However, Dr.

10   Behniwal observed fluctuating energy and, as discussed above, the ALJ was not correct in

11   rejecting Dr. Behniwal's conclusions in favor of the contrary conclusions reached by non-

12   examining sources.  Further, the ALJ's decision does not appear to contain any discussion of

13   third-party reports submitted by plaintiff's roommate, Deborah Wender, which indicate that

14   plaintiff sleeps excessively and is nonetheless often exhausted.  Therefore, on remand, the ALJ

15   should also re-evaluate the medical evidence concerning plaintiff's claims of fatigue and what

16   limitations, if any, fatigue has on her ability to work.

17           3.    Mental Impairments

18           The ALJ concluded that plaintiff has mental impairments that are severe.

19   Specifically, the ALJ determined that plaintiff's bipolar disorder and cyclothymic disorder are

20   severe impairments,  However, as discussed above, the court concludes that the ALJ's residual

21   functional capacity assessment is flawed with respect to limitations caused by these impairments

22   because it does not properly account for the opinions of Drs. Behniwal and Finkel.

23   / / /

24   / / /

25   / / /

26   / / /

## C.   Plaintiff's Credibility

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

The ALJ accurately summarized plaintiff's hearing testimony as follows:

At the hearing, the claimant testified that she is unable to engage in work activity due to fatigue, depression, problems with concentration, pain due to fibromyalgia, and problems with her bowels.  Many days she spends the day in bed.  She has breakfast at 6:30 a.m., helps the children get dressed, and drives the children to school.  She spends the day sitting in a recliner, reading the paper, or watching television.  She drives her daughter to and from school.  She testified that she could lift only ten pounds.  She does

not cook or do laundry. The children and her roommate do the housework. The claimant is able to sleep eight hours a night and naps approximately four hours a day.

As to plaintiff's credibility, the ALJ made several findings throughout the decision:

Although the claimant alleges that she suffers from diarrhea, constipation, and abdominal cramping due to irritable bowel syndrome, her abdominal examinations have been normal.

* * *

Considering the claimant's subjective complaints, a careful review of the subjective[4] evidence of record also does not support persistent debilitating fatigue. Though fatigue was noted on occasion, treatment notes only rarely referred to the claimant's actual complaints of fatigue, and do not include clinical observations of a tired or weakened appearance. . . . It is concluded that the claimant's allegations of chronic fatigue are not severe.

* * *

. . . Claimant's . . . statements indicate that her activities are now quite limited and that her condition has deteriorated. However, the record does not provide evidence of an ongoing or worsening condition that would significantly reduce the claimant's functioning at this time. There is no indication that the claimant's treating practitioner changed the claimant's treatment program or her medications.

* * *

There is a lack of medical documentation of an impairment which would cause extreme pain or pain which would compromise the claimant's ability to perform work-related activities. . . .

* * *

The undersigned is of the opinion that the claimant's allegations are less than fully credible, and they are not found to be supported by the weight of the medical evidence, which reveals few objective abnormalities. Consequently, the undersigned finds that the claimant's allegations of pain and limitation in the record are not fully credible and not consistent with the medical record.

From this, the court finds that the ALJ considered: (1) the lack of objective findings to support plaintiff's complaints of abdominal problems; (2) the lack of objective findings to support plaintiff's complaints of debilitating fatigue; (3) plaintiff's daily activities to support plaintiff's

---

[4]        The court assumes the ALJ meant to say "objective."

1  statements of limited activities and deteriorating condition; and (4) the lack of medical

2  documentation to support plaintiff's pain symptoms.

3            Contrary to the ALJ's analysis, the court does not find that plaintiff's hearing

4  testimony is inconsistent with the record.  First, because it is undisputed that there is evidence of

5  an underlying impairment – fibromyalgia, which the ALJ determined to be severe – it is not

6  appropriate to consider the lack of objective medical findings to support pain testimony in

7  determining credibility.   See Bunnell, 947 F.2d at 347-48.  Second, the ALJ's conclusion that

8  plaintiff's testimony is inconsistent with evidence concerning her daily activities is not supported

9  by the record.  Specifically, the ALJ does not mention third-party statements provided by

10 plaintiff's roommate, which are entirely consistent with plaintiff's testimony.  Further, plaintiff's

11 own statement of daily activities, provided at the time she applied for benefits, is consistent with

12 her hearing testimony.  Both of these statements, describe debilitating levels of pain and fatigue

13 and are consistent with severe fibromyalgia.  The ALJ seems to rely on the lack of objective

14 abnormalities.  However, as discussed above, this is entirely consistent with fibromyalgia and not

15 a proper reason to reject pain testimony.

16            On remand, the ALJ should re-evaluate plaintiff's residual functional capacity in

17 light of the limitations plaintiff states are posed by pain associated with fibromyalgia.

18            **D.    Vocational Expert Testimony**

19            The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

20 disability for various combinations of age, education, previous work experience, and residual

21 functional capacity.  The Grids allow the Commissioner to streamline the administrative process

22 and encourage uniform treatment of claims based on the number of jobs in the national economy

23 for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

24 460-62 (1983) (discussing creation and purpose of the Grids).

25 / / /

26 / / /

1        The Commissioner may apply the Grids in lieu of taking the testimony of a

2    vocational expert only when the grids accurately and completely describe the claimant's abilities

3    and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

4    Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

5    Grids if a claimant suffers from non-exertional limitations because the Grids are based on

6    strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a

7    claimant has an impairment that limits his or her ability to work without directly affecting his or

8    her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

9    the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

10   Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

11   even when a claimant has combined exertional and non-exertional limitations, if non-exertional

12   limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

13   1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

14       In cases where the Grids are not fully applicable, the ALJ may meet his burden

15   under step five of the sequential analysis by propounding to a vocational expert hypothetical

16   questions based on medical assumptions, supported by substantial evidence, that reflect all the

17   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

18   where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

19   ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

20   1341 (9th Cir. 1988).

21       Plaintiff argues that the ALJ erred by relying on the Grids to determine that she

22   was not disabled because her non-exertional mental limitations required vocational expert

23   testimony.  Defendant argues that, because the ALJ properly rejected evidence of non-exertional

24   limitations, the ALJ correctly relied on the Grids.  However, as discussed above, the court finds

25   that the ALJ erred in rejecting the evidence of plaintiff's non-exertional limitations posed by

26   mental impairments.  The ALJ also erred with respect to the credibility of plaintiff's testimony of

1  limitations caused by pain.  On remand, if such limitations are found after a proper evaluation of

2  the evidence, the ALJ should engage a vocational expert.

3

4                                          **IV.  CONCLUSION**

5              The court notes that, as to plaintiff's residual functional capacity, the ALJ

6  concluded that plaintiff retains the capacity to perform the full range of light work.  He also

7  stated: ". . . The functional capacity to perform a full range of light includes the functional

8  capacity to perform sedentary as well as light work."  Based on limitations potentially posed by

9  plaintiff's mental impairments as well as pain associated with fibromyalgia, the court is left to

10  wonder whether plaintiff, in fact, is not limited to only sedentary work.  This, of course, if for the

11  ALJ to determine on remand.

12              For the foregoing reasons, this matter will be remanded under sentence four of 42

13  U.S.C. § 405(g) for further development of the record and/or further findings addressing the

14  deficiencies noted above.

15              Accordingly, IT IS HEREBY ORDERED that:

16              1.        Plaintiff's motion for summary judgment is granted;

17              2.        The Commissioner's cross motion for summary judgment is denied;

18              3.        This matter is remanded for further proceedings consistent with this order;

19  and

20              4.        The Clerk of the Court is directed to enter judgment and close this file.

21

22  DATED:  February 29, 2008

23

24  **CRAIG M. KELLISON**
    UNITED STATES MAGISTRATE JUDGE

25

26